IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ABBVIE, INC., et al. | : | NO. 14-5151 |

MEMORANDUM

Bartle, J.                                    December 14, 2015

Before the court are the motions of the plaintiff
Federal Trade Commission ("FTC") to compel the production of
documents withheld or redacted during discovery by the
defendants AbbVie, Inc., Abbott Laboratories, and Unimed
Pharmaceuticals, LLC (collectively "AbbVie") and the defendant
Besins Healthcare, Inc. ("Besins").  Specifically, the FTC seeks
four documents from Besins and forty-one documents from AbbVie.
The defendants assert that these documents are protected by the
attorney-client privilege and/or the work product doctrine.  The
defendants have submitted these documents to the court for in
camera review.

The FTC filed this action in September 2014.  In
Count I of the complaint, the FTC alleges that AbbVie and Besins
filed sham patent infringement actions against Teva
Pharmaceuticals USA, Inc. ("Teva") and Perrigo Company
("Perrigo") to delay approval of their generic drugs in

violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The court previously dismissed Count II of the complaint, which asserted that AbbVie and Teva entered into an anticompetitive settlement of that patent litigation.

In January 2003, Unimed Pharmaceuticals, Inc. ("Unimed") and Besins obtained U.S. Patent No. 6,503,894 ("the '894 patent") for the brand-name testosterone drug, AndroGel. The '894 patent specifically mentions the penetration enhancer isopropyl myristate.[1]  Solvay Pharmaceuticals, Inc. ("Solvay") subsequently acquired Unimed.  AbbVie's predecessor, Abbott Laboratories ("Abbott"),[2] later acquired Solvay in 2010.  In April 2011 and October 2011, the defendants filed patent infringement lawsuits against Teva and Perrigo, respectively, for allegedly violating the '894 patent.  At the time, Teva and Perrigo were in the process of seeking approval of their generic versions of AndroGel from the Food and Drug Administration ("FDA").  The penetration enhancers used in the Teva and Perrigo generic drugs were isopropyl palmitate and isostearic acid, respectively.

_____

1.  The court notes that isopropyl myristate is specifically referenced by name in the '894 patent.  We do not opine on whether or not the '894 patent covers additional penetration enhancers.

2.  AbbVie came into existence in January 2013, when Abbott divided into two independent companies: Abbott and AbbVie.

I.

Ordinarily, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." See Fed. R. Civ. P. 26(b)(1). The attorney-client privilege and work product doctrine are two exceptions to this rule. The burden to establish that a privilege applies is on the party asserting the privilege. See Conoco, Inc. v. U.S. Dep't of Justice, 687 F.2d 724, 730 (3d Cir. 1982); Matter of Grand Jury Empaneled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979). Both "[d]eterminations of the applicability of privileges to particular documents" and "decisions as to the amount of information that the District Court needs in order to make such determinations are committed to the District Judge's discretion."[3] See Chao v. Koresko, 2005 WL 2521886, at *4 (3d. Cir. Oct. 12, 2005); Rossi v. Standard Roofing, Inc., 156 F.3d 452, 477 n.16 (3d Cir. 1998). The court may consider affidavits or declarations submitted by the parties in assessing whether the privileges apply. See, e.g., Haines v. Liggett Grp., Inc., 975 F.2d 81, 91-92 (3d Cir. 1992); In re Chevron Corp., 633 F.3d 153, 165-66 (3d Cir. 2011).

---

3.   Besins claims that as long as its privilege log entry is adequate, the burden shifts to the FTC to prove that the document must be produced. We disagree. Where the court has the documents before it for in camera review, the court will look beyond the privilege log descriptions in assessing whether the attorney-client privilege applies. See, e.g., Chao v. Koresko, 2005 WL 2521886, at *4 (3d. Cir. Oct. 12, 2005).

The attorney-client privilege precludes discovery of: "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." In re Teleglobe Commc'ns Corp., 493 F.3d 345, 359 (3d Cir. 2007).  It aims "to encourage full and frank communications between attorneys and their clients." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  Yet, "[b]ecause the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." Westinghouse Elec. Corp. v. Republic of Phil., 951 F.2d 1414, 1423 (3d Cir. 1991). It is "strictly confined within the narrowest possible limits consistent with the logic of its principle." SmithKline Beecham Corp. v. Apotex Corp., 232 F.R.D. 467, 472 (E.D. Pa. 2005); In re Grand Jury Investigation, 599 F.2d 1224, 1235 (3d Cir. 1979).

While the privilege protects facts provided in confidence by the client to the attorney, "[a]n important limitation of the privilege is that it 'does not extend to facts provided by an attorney that do not reflect client confidences.'"  See Samahon v. U.S. Dep't of Justice, 2015 WL 857358, at *10 (E.D. Pa. Feb. 27, 2015) (citation omitted). "If the attorney merely conveys facts acquired from persons or sources other than a client, the communication is not privileged." Becker v. E.I. Du Pont de Nemours & Co., Inc.,

1988 WL 54022, at *2 (E.D. Pa. May 25, 1988).  Given that under the attorney-client privilege "[f]acts are discoverable, [even though] the legal conclusions regarding those facts are not," a party cannot "refuse to disclose facts simply because that information came from a lawyer."  See Rhone-Poulenc Rorer, Inc. v. Home Indem. Co., 32 F.3d 851, 864 (3d Cir. 1994).  Yet, technical information provided to facilitate receiving legal advice during the patent application process is protected.  See SmithKline Beecham Corp., 232 F.R.D. at 483; In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 806 (Fed. Cir. 2000).

The communication must be between privileged persons, such as the client, attorney, and "any of their agents that help facilitate attorney-client communications or the legal representation."  See In re Teleglobe, 493 F.3d at 359; Spear v. Fenkell, 2015 WL 3822138, at *1 (E.D. Pa. June 1, 2015).  In the corporate context, employee communications with corporate counsel are privileged when the employees possess:

> [i]nformation, not available from upper-echelon management, . . . needed to supply a basis for legal advice [and] . . . [t]he communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice.

Upjohn Co., 449 U.S. at 394.  In addition, employees may share legal advice received from attorneys with one another "so that

the corporation may be properly informed of legal advice and act appropriately." Se. Pa. Transp. Auth. v. CaremarkPCS Health, L.P., 254 F.R.D. 253, 258-59 (E.D. Pa. 2008); SmithKline Beecham Corp., 232 F.R.D. at 477. There need not be an attorney participating in the communication if the communication conveys legal advice to other employees so that they may comply. See King Drug Co. of Florence, Inc. v. Cephalon, Inc., 2013 WL 4836752, at *8 (E.D. Pa. Sep. 11, 2013).

Yet, the involvement of an attorney in the communication does not mean that the privilege must apply. Documents lacking any substantive attorney involvement are not privileged. See SmithKline Beecham Corp., 232 F.R.D. at 477. "In general, attorney-client privilege does not shield documents merely because they were transferred to or routed through an attorney." Id. at 478 (citation omitted). Where the party alleges merely that an internal document was drafted by non-attorneys and incorporates attorney comments, "[t]his is an insufficient basis to deem the document protected by the attorney-client privilege." See In re Avandia Mktg., Sales Practices & Prods. Liab., 2009 WL 4807253, at *3 (E.D. Pa. Oct. 2, 2009). In particular, where the party "does not identify any specific attorney with whom a confidential communication was made. . . . [the party] has failed to 'provide sufficient detail to demonstrate fulfillment of the legal requirements for

-6-

application of the privilege.'"  SmithKline Beecham Corp., 232
F.R.D. at 477 (citation omitted).

     Further, while "[d]isclosing a communication to a
third party unquestionably waives the privilege," the third-
party consultant and common-interest privilege are two
exceptions to this rule.  See In re Teleglobe, 493 F.3d at 361.
These exceptions "do[ ] not apply unless the conditions of
privilege are otherwise satisfied."  In re Processed Egg Prods.
Antitrust Litig., 278 F.R.D. 112, 118 (E.D. Pa. 2011) (citation
omitted).  The party asserting that an exception applies must
first establish that the attorney-client privilege applies.
See, e.g., id.; United States v. LeCroy, 348 F. Supp. 2d 375,
382 (E.D. Pa. 2004).

     Under the third-party consultant exception, disclosure
does not waive the attorney-client privilege so long as
"disclosure is necessary to further the goal of enabling the
client to seek informed legal assistance."  In re Chevron Corp.,
633 F.3d at 165 (quoting Westinghouse Elec. Corp., 951 F.2d at
1428.  In the corporate context, "consultants are treated
similarly to employees for purposes of the privilege analysis,
and communications with consultants are privileged as long as
they 'were kept confidential and made for the purpose of
obtaining or providing legal advice.'"  See King Drug Co., 2013

WL 4836752, at *6 (quoting In re Flonase Antitrust Litig., 879
F. Supp. 2d 454, 459-60 (E.D. Pa. 2012)).

Under the common interest doctrine, communications
between attorneys representing separate clients are privileged
when the clients share a common interest in the outcome of
litigation.  See In re Teleglobe, 493 F.3d at 364; In re
Processed Egg Prods., 278 F.R.D. at 118; Katz v. AT&T Corp., 191
F.R.D. 433, 437 (E.D. Pa. 2000).  The doctrine applies only
where attorneys, not the clients, share the information.  See In
re Processed Egg Prods., 278 F.R.D. at 118; In re Teleglobe, 493
F.3d at 364.  Although the shared interest must be nearly
identical where two clients share the same attorney, "[i]n the
community-of-interest context, on the other hand, because the
clients have separate attorneys, courts can afford to relax the
degree to which clients' interests must converge without
worrying that their attorneys' ability to represent them
zealously and single-mindedly will suffer."  See In re
Teleglobe, 493 F.3d at 366.  The clients in the community of
interest "must share at least a substantially similar legal
interest" against a common adversary.  See id. at 365.  The
doctrine "'applies in civil and criminal litigation, and even in
purely transactional contexts.'"  Id. at 364.  However the
shared interest must be "an identical legal, and not solely

commercial, interest." Katz, 191 F.R.D. at 437; In re Processed

Egg Prods., 278 F.R.D. at 118 n.6.

Lastly, the attorney-client privilege only applies if

the communication was made "for the purpose of securing legal

advice." See In re Ford Motor Co., 110 F.3d 954, 965 (3d Cir.

1997), abrogated on other grounds by, Mohawk Indus., Inc. v.

Carpenter, 558 U.S. 599 (2009). In the corporate setting, it is

often difficult to determine whether a communication was made

for business or legal purposes because legal advice "is often

intimately intertwined with and difficult to distinguish from

business advice." See La. Mun. Police Emps. Ret. Sys. v. Sealed

Air Corp., 253 F.R.D. 300, 306 (D.N.J. 2008) (citation omitted).

In recognition that "[i]n-house counsel performs a dual role of

legal advisor and business advisor," Faloney v. Wachovia Bank,

N.A., 254 F.R.D. 204, 209 (E.D. Pa. 2008), "the corporation

'must clearly demonstrate that the communication in question was

made for the express purpose of securing legal not business

advice.'" Kramer v. Raymond Corp., 1992 WL 122856, at *1 (E.D.

Pa. May 29, 1992) (quoting Aamco Transmissions, Inc. v. Marino,

1991 WL 193502, at *3 (E.D. Pa. Sept. 24, 1991)). A company's

"decision on how to market or advertise a product, or what

conditions of sale should apply" is not privileged because

"[a]lthough it is based on legal advice, [the communication] is

primarily a business policy." See In re Domestic Drywall

Antitrust Regulation, 2014 WL 5090032, at *4 (E.D. Pa. Oct. 9,
2014).  "[W]here a communication contains both legal and
business advice, the attorney-client privilege will apply only
if the primary purpose of the communication was to aid in the
provision of legal advice."  See Claude P. Bamberger Intern.,
Inc. v. Rohm & Haas Co., 1997 WL 33768546, at *2 (D.N.J. Aug.
12, 1997).

II.

        The work product doctrine precludes discovery of
documents and other tangible items which were (1) created in
reasonable anticipation of litigation by or for a party and
(2) prepared primarily for the purpose of litigation.  See
Hickman v. Taylor, 329 U.S. 495, 508 (1947); Fed. R. Civ. P.
26(b)(3).  The doctrine "'shelters the mental processes of the
attorney, providing a privileged area within which he can
analyze and prepare his client's case.'"  In re Cendant Corp.
Sec. Litig., 343 F.3d 658, 661-62 (3d Cir. 2003) (quoting United
States v. Nobles, 422 U.S. 225, 238 (1975)).  It protects not
only materials created by the attorney, but also those created
with "the assistance of investigators and other agents."  See
Nobles, 422 U.S. at 238.

        First, the document must have been created in
reasonable anticipation of litigation.  The relevant inquiry is
"whether in light of the nature of the document and the factual

-10-

situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (quoting In re Grand Jury Proceedings, 604 F.2d 798, 803 (3d Cir. 1979)). The court considers the author's subjective state of mind and whether the anticipation of litigation is objectively reasonable. See id. at 1260; Advanced Tech. Assocs. v. Herley Indus., Inc., 1996 WL 711018, at *6 (E.D. Pa. Dec. 5, 1996). The doctrine protects "material prepared or collected before litigation actually commences" but at least "some possibility of litigation must exist." See In re Grand Jury Investigation, 599 F.2d at 1229. At a minimum, there must be some "litigation on the horizon." See In re Grand Jury Subpoena, 745 F.3d 681, 694 (3d Cir. 2014).

Second, the document must have been prepared primarily for the purpose of litigation. See Martin, 983 F.2d at 1260-61; Advanced Tech. Assocs., 1996 WL 711018, at *6. "Even where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product [doctrine] still depends primarily on the reason or purpose for the document production." In re Gabapentin Patent Litig., 214 F.R.D. 178, 184 (D.N.J. 2003). The doctrine does not apply to "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for

-11-

other nonlitigation purposes'" even if those materials are later useful in litigation.  See Fed. R. Civ. P. 26(b)(3) advisory committee's note to 1970 amendment; Martin, 983 F.2d at 1260.

The work product doctrine is not absolute.  There is an exception where the document is "otherwise discoverable," and a party shows "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  See Fed. R. Civ. P. 26(b)(3).

III.

The FTC contends that Besins improperly redacted four documents.  It says these documents are relevant to central issues in this litigation, including (1) whether AbbVie and Besins filed patent infringement lawsuits against Teva and Perrigo to block approval of their generic products in violation of antitrust laws, and (2) whether Besins knew at the time it filed a patent infringement lawsuit in 2011 that its original claims were narrowed to a single penetration enhancer not used in the Teva or Perrigo products.

In its privilege log, Besins describes the first challenged document as a December 13, 2001 "[e]mail regarding recent meeting with patent examiner and examiner's decision regarding allowing patent."  The email was sent by outside counsel for Besins in the United States, Joseph Mahoney

-12-

("Mahoney"), to outside counsel in Europe, Cyra Nargolwalla. Jean-Louis Anspach, the President and CEO of Unimed, was copied on the email.  Cyra Nargolwalla forwarded the email to Besins employee Phillipe Cornu who forwarded the email to other Besins employees.

The only redacted sentence in this document relayed a statement made by a United States Patent and Trademark Office examiner to Mahoney concerning the patent application.  It contained an unprivileged "fact[ ] provided by an attorney that do[es] not reflect client confidences."  See Samahon, 2015 WL 857358, at *10.  There are no accompanying legal conclusions or perceptions, and the redacted sentence does not include qualifying language such as "I believe" or "my opinion is."  The attorney-client privilege does not protect communications in which "the attorney merely conveys facts acquired from persons or sources other than a client."  See Becker, 1998 WL 54022, at *2.

Although Besins claims that the redacted statement succinctly incorporated Mahoney's mental impressions, the court cannot plausibly read the sentence in this way.  Besins argues that the redacted statement contains a mental impression because it is not a direct quote from the publically available interview summary and because the patent was not yet finalized.  This misconstrues the nature of the privilege.  A discoverable fact

can emerge from a meeting with the patent examiner regardless of whether that fact is reflected in the interview summary notes or whether the patent application has been finally approved. Further, the court has examined the interview summary notes and does not find those notes inconsistent with Mahoney's factual statement. Besins cannot "refuse to disclose facts simply because that information came from a lawyer." See Rhone-Poulenc Rorer, 32 F.3d at 864. Accordingly, Besins has not met its burden to demonstrate that this email is protected by the attorney-client privilege.[4]

Turning to the second challenged document, Besins claims the attorney-client privilege protects an "[e]mail from Tom Macallister [sic] reporting on: (1) Besins's worldwide business developments concerning AndroGel and other matters and describing legal implications associated with possible courses of action concerning same and (2) the present status of the ongoing Teva and Perrigo litigations." The email was sent by Thomas MacAllister to Besins senior managers Antoine Besins, Leslie Grunfeld, and Jay Bua on December 1, 2011. According to MacAllister's signature line in that email, MacAllister was

---

4.   Although Besins claims that Mahoney's mental impressions are conveyed in the redacted sentence, Besins does not assert the work product doctrine. Where the party "ha[s] not even claimed, much less demonstrated that the [documents] . . . were prepared in anticipation of, or in preparation for, litigation," the work product doctrine does not apply. See Cedrone v. Unity Sav. Ass'n, 103 F.R.D. 423, 426 (E.D. Pa. 1984).

President and Chief Executive Officer of "BHR Pharma, LLC" which is a "Besins Healthcare Company."  The signature line also noted that MacAllister had a law degree and a Ph.D. degree.  Besins characterizes MacAllister as in-house counsel, who "also served in a business capacity as president and CEO."[5]

Although information related to other products and pending matters is provided in full, the paragraphs labeled "AndroGel 1% BE" and "AndroGel 1.62% BE" contain redactions.[6]  A paragraph labeled "Litigation" is also redacted.  Besins contends that these redacted portions contain MacAllister's legal advice in light of settlement negotiations that were either in progress or foreseeable at the time.  While it concedes that these paragraphs mix business and legal issues, it maintains that "the salient information and opinion conveyed represents a lawyer's reading of the legal considerations that he is advising his client to consider in making a decision."

---

5.  Besins makes this claim in briefing papers filed in response to the FTC's motion to compel production but has not submitted a sworn declaration in support of this contention.

6.  Besins explained that "BE" refers to bioequivalence studies. These studies are performed to determine whether two similar drugs are effectively the same.  "The Federal Food, Drug, and Cosmetic Act . . . and FDA regulations require that an [abbreviated new drug applications] applicant submit, among other things, information showing that the applicant's drug product is bioequivalent to the approved product designated by FDA as the reference listed drug."  See U.S. Food & Drug Ass'n, Submission of Summary Bioequivalence Data for ANDAs: Guidance for Industry, at 2 (2011).

In the paragraph labeled "AndroGel 1% BE" in document 2, MacAllister referenced pending litigation to estimate when competitors will likely enter the market for generic drugs. MacAllister indicated that Besins was itself deciding whether or not to enter that market.  MacAllister relied on the estimated dates that competitors will enter the market to estimate a date when Besins should enter the market.  He further discussed the commercial benefits of undergoing bioequivalence studies in light of the anticipated competition.

A bioequivalence study is a required component of the application for FDA approval of a generic drug.  A company cannot sell generic drugs without having first performed such a study.  Thus, a company decides whether or not to move forward in obtaining FDA approval and perform the bioequivalence study if the company determines in its business judgment that the product will be profitable.  The number of anticipated competitors is one relevant business consideration that the company takes into account in assessing its own potential for profitability.

MacAllister's communications, which undertook this business analysis, reflect business concerns.  As such, despite making reference to legal matters, this paragraph is primarily, if not exclusively, concerned with providing business advice.

-16-

See Kramer, 1992 WL 122856, at *1; Domestic Drywall, 2014
WL 5090032, at *4.

The same is true of the first redacted portion in the
paragraph labeled "AndroGel 1.62% BE" in document 2.  Here,
Besins redacts the date it expected to enter the generic market.
This estimate is the product of a business analysis of the
competition in the market for the generic drug.  See Kramer,
1992 WL 122856, at *1.  In addition, in unredacted text
immediately after the entry date estimate, MacAllister discussed
possible locations for conducting the bioequivalence study.  The
entry date is mentioned to assess future steps Besins should
take in pursuing its business strategy, including conducting
bioequivalence studies, in light of competitor entry dates.  It
is not mentioned for the purpose of obtaining legal advice.  See
In re Teleglobe, 493 F.3d at 359.  Accordingly, Besins has not
carried its burden to show that this redacted portion was for
the purpose of obtaining or providing legal assistance.

The second redacted portion in the "AndroGel 1.62% BE"
paragraph contemplated a business decision which had legal
implications.  Although this redacted portion "examined the
legal implications of some of those concerns" see In re Ford
Motor Co., 110 F.3d at 966, it ultimately sought to prevent a
product launch delay because be harmful to its business
interests.  MacAllister asked his senior management colleagues

-17-

"**WILL YOU PLEASE LET ME KNOW YOUR THOUGHTS ON THIS POINT?**,"
thereby eliciting business advice from business colleagues
rather than providing legal advice.  Construing the privilege
narrowly as required, this portion of the email is not
privileged because it was concerned with receiving business
advice, not providing legal advice.  See Kramer, 1992 WL 122856,
at *1; Westinghouse Elec. Corp., 951 F.2d at 1423.

The third paragraph of document 2, entitled
"Litigation," paragraph discussed pending litigation but is not
privileged because Besins has not carried its burden to
demonstrate "the primary purpose of the communication was to aid
in the provision of legal advice." Claude P. Bamberger Intern.,
Inc., 1997 WL 33768546, at *2; Faloney, 254 F.R.D. at 209-10.
For example, no privilege applies when business colleagues
discuss pending litigation and the likelihood of settlement so
as to plan a business strategy because such a discussion is not
for the purpose of providing or obtaining legal advice.  See
In re Teleglobe, 493 F.3d at 359.  Here, MacAllister certainly
updated Besins senior management on the status of pending
litigation.  Yet, after a careful in camera review, we cannot
distinguish the litigation matters discussed in this paragraph
from those discussed earlier in the email.  As the court already
explained, those other portions of the email were concerned with
calculating competitor market entry dates to plan business

-18-

strategy.  To the extent that MacAllister's "Litigation"
paragraph discussed pending litigation and estimated the
likelihood that that litigation will settle, MacAllister did
nothing more than provide context for his business colleagues to
understand the significance of his earlier discussions.  Besins
has not met its burden to prove otherwise.

Again, construing the privilege narrowly, we find that
this case is distinguishable from In re Ford Motor Co., 110 F.3d
954, 966 (3d Cir. 1997).  There, our Court of Appeals held that
the attorney-client privilege applied to portions of a business
meeting where in-house counsel proposed legal solutions to
automobile safety concerns raised by the client.  In that case,
"the communications were privileged because Ford had concerns
about a particular product, Ford's lawyer examined the legal
implications of these concerns and proposed a course of action,
and the meeting was called, in part, to discuss this proposal."
See Faloney, 254 F.R.D. at 210; In re Ford Motor Co., 110 F.3d
at 966.  Here, Besins has not demonstrated that MacAllister was
proposing a course of action to address legal concerns.  Rather,
MacAllister offered a business strategy to address business
concerns.  Of course, a business strategy is always infused with
some legal concerns, particularly where the business strategy
focuses on the likelihood of competitor actions.  Because
MacAllister's communication was for the purpose of business

-19-

rather than legal concerns, this communication is not privileged.

The privilege log describes the third document as an "[e]mail to counsel regarding Isosteric [sic] Acid Analysis" and states that the redaction is based on attorney-client privilege. This February 22, 2011 email was sent by Maynard Lichty, a senior director of pharmaceutical development for BHR Pharma, LLC, to MacAllister and in-house counsel Denis Canet. The entire email body is redacted. The subject of the email and title of the attached document were not redacted and read: "isostearic acid" and "Quotation Request for Isostearic Acid Analysis," respectively. The attachment to the document was produced in its entirety.

We find that the document is protected by the attorney-client privilege and need not be produced to the FTC. This document is a confidential communication by the client to its attorney for the purpose of obtaining legal assistance. See In re Teleglobe, 493 F.3d at 359.

The fourth document is a July 2, 2001 email from in-house counsel Brigitte Taravella to several individuals including: (1) outside counsel Cyra Nargolwalla; (2) employees Medecin Consultant ("Bruno de Lignieres"), Florence Hainque, Valerie Masin-Eteve; and (3) third parties Jerome Besse and Professor Wepierre. Besins supplied two privilege log entries

claiming attorney-client privilege for this document.  The first entry is for an "[e]mail transmitting expert analysis of '894 patent application and outlining the purpose and goals of an upcoming meeting between Besin [sic] personnel and Besins's French IP counsel."  The second entry is for the attachment to that email and reads: "[c]omments of experts/professors on draft '894 patent application prepared in anticipation of upcoming meeting with Besins's French IP counsel regarding the '894 patent application."  The document is in French, and Besins has provided the court with a verified translation.

Setting aside for the moment the issue of whether a waiver based on disclosure to a third party has occurred, the court finds that the attorney-client privilege otherwise applies to this email and its attachments.  The attorney-client privilege protects "an exchange of technical information necessary so that an . . . employee c[an] secure legal services or legal advice" on behalf of the client corporation.  See SmithKline Beecham Corp., 232 F.R.D. at 481.  Both the email and its attachment are confidential communications between Besins and its attorneys for the purpose of providing and receiving legal assistance with the patent application.

Turning now to the issue of waiver, we find that Besins did not waive the attorney-client privilege by disclosing the communication to third-party consultants, Wepierre and

-21-

Besse.[7]  A party does not "waive the privilege merely by
revealing confidential communications to its own consultant."
See id. at 477.  Besins has not waived the attorney-client
privilege where it relied on Wepierre and Besse to supply
technical knowledge necessary to facilitate the provision of
"competent and accurate legal advice" concerning its patent
application.  See In re Flonase, 879 F. Supp. 2d at 459-60.

IV.

The FTC has also moved to compel production of forty-
one documents that AbbVie has redacted or withheld.  As with the
Besins documents, the FTC claims that these materials are not
privileged because they were either prepared for business
purposes or shared with third parties.  The FTC asserts that
these documents are relevant to: (1) whether AbbVie has monopoly
power in the AndroGel market; (2) whether the defendants
improperly used sham litigation to block approval of
competitors' generic drug applications; (3) whether AbbVie knew
that its patent claims were narrowed to a single penetration
enhancer at the time it filed the patent infringement suit; and

_____

7.  According to Besins, at the time of this communication,
Wepierre "was a professor in the pharmacy school/division of the
University of Paris-Sud and an expert in pharmacological
toxicology" and "[a]t the request of Besins, in the mid-1990s,
he worked on early testing of a testosterone gel formulation."
"Jerome Besse was an employee of Galenix Innovations, a research
laboratory with which Besins worked in developing various
hormone based products including those involving testosterone."

(4) the amount of equitable monetary relief available in this action.  AbbVie has submitted declarations, which it claims establish that the redacted materials are privileged.

For the first eighteen challenged documents, AbbVie claims work product protection in its privilege log for "[s]preadsheet[s] prepared for and at the request of counsel for use in legal analysis regarding AndroGel forecasting."  By declaration, AbbVie's in-house counsel Perry Siatis ("Siatis") stated that an Abbott employee created these forecasting documents in August 2011 at his request for the purpose of assessing settlement of the patent infringement litigation with Teva[8] and anticipated litigation with Perrigo.[9]  In addition, by sworn declaration, Abbott's non-attorney employee, Donna O'Connor, stated that she and another employee "created the spreadsheets for the specific and sole purpose of analyzing the relevant data and transmitting the results of the analyses to Mr. Siatis in accordance with Mr. Siatis' request to [her]."

Relying on these sworn declarations and our own in camera review, we find that the documents are privileged work product prepared at counsel's request because of and in

---

8.  AbbVie and Besins sued Teva in April 2011.  AbbVie, Besins, and Teva agreed to settle this lawsuit in December 2011.

9.  AbbVie and Besins sued Perrigo in October 2011.  AbbVie, Besins, and Perrigo agreed to settle this lawsuit in December 2011.

-23-

anticipation of litigation.  See Haines, 975 F.2d at 91-92;
In re Chevron Corp., 633 F.3d at 165-66.  The work product
doctrine applies to materials created by attorneys and their
agents in anticipation of litigation.  The FTC has not
demonstrated a "substantial need for the materials to prepare
its case" nor that it "cannot, without undue hardship, obtain
their substantial equivalent by other means."  See Fed. R. Civ.
P. 26(b)(3); In re Processed Egg Prods., 278 F.R.D. at 118.

As to document 19, the privilege log claims attorney-
client privilege for an "[e]mail thread requesting legal advice
and providing information for the purpose of obtaining legal
advice regarding AndroGel regulatory strategies and decision to
file Perrigo AndroGel patent suit."  The FTC argues that the
email thread contains business information, not privileged legal
information.  It says that the first email in the thread, which
is unredacted, provides "competitive intelligence" information
about rival products to six business employees.  The next email
in the thread, which is redacted, was sent by James Hynd,
AbbVie's Vice President of Sales and Marketing, forwarding the
original competitive intelligence email to two more business
employees on August 3, 2011.  The final redacted email was sent
by James Hynd and forwarded the email thread to four employees
including in-house counsel Siatis on August 9, 2011.  Siatis

stated in a sworn declaration that the email thread reflects a request for his legal advice.

As for the August 3, 2011 email, the redaction was improper and the content of this email must be produced.  There is no privilege where one non-attorney employee states to another non-attorney employee his or her desire to speak with in-house counsel.  This is not a communication between privileged persons for the purpose of obtaining legal advice. See In re Teleglobe, 493 F.3d at 359.  In fact, this email does not even contain confidential information.  It is clear from subsequent unredacted emails and sworn declarations that in-house counsel was in fact consulted on this subject.

In addition, AbbVie has not met its burden to demonstrate that the August 9, 2011 email to Siatis is privileged.  Although Siatis claimed by sworn declaration that the email was a request for legal advice, AbbVie has not provided any supporting information that would allow the court to reach the same conclusion.  The attorney-client privilege does not apply to every communication between corporate counsel and corporate employees.  See In re Domestic Drywall Antitrust Regulation, 2014 WL 5090032, at *3; Kramer, 1992 WL 122856, at *1.  It also does not apply if the client seeks regulatory advice for a business purpose.  See In re Avandia, 2009 WL 4807253, at *6; In re Grand Jury Matter, 147 F.R.D. 82, 85

-25-

(E.D. Pa. 1992).  Rather, the communication must have been "for the purpose of securing legal advice."  See In re Ford Motor Co., 110 F.3d at 965.  "[W]hen a client's ultimate goal is not legal advice, but is rather accounting, medical, or environmental advice, the privilege is inapplicable."  In re Grand Jury Matter, 147 F.R.D. at 85.  In the corporate context, "[a]lmost any act by a business . . . carries the potential for running afoul of some law or regulation or giving rise to a civil action. . . . [yet] [t]he fact of extensive or pervasive regulation does not make the everyday business activities legally privileged from discovery."  Rowe v. E.I. DuPont de Nemours & Co., 2008 WL 4514092, at *9 (D.N.J. Sep. 30, 2008).

Here, an AbbVie non-lawyer employee alerted in-house counsel that "we ought to consider a regulatory strategy." Based on the information in the record about the nature of this request, the court does not find that this communication sought legal advice.  As a participant in a highly-regulated industry, a pharmaceutical company must consider regulatory matters in making nearly all of its business decisions.  We note that the attorney-client privilege "is construed narrowly."  See Westinghouse Elec. Corp., 951 F.2d at 1423.  AbbVie has not met its burden to demonstrate that this email was sent to in-house counsel for the purpose of securing legal advice rather than business advice.  See Kramer, 1992 WL 122856, at *1.

-26-

Documents 20 to 30[10] are PowerPoint presentations drafted by Abbott employees in 2009.  These due diligence documents concern Abbott's acquisition of Solvay, which has code names including "Project Chocolate" and "Project Phoenix." Abbott acquired Solvay in February 2010.  At the time of this acquisition, Solvay and Besins co-owned the AndroGel patent. The privilege log entries claim: (1) attorney-client privilege for documents 20, 25, 26, 27, and 29 described as "[d]ue diligence performed at request of counsel regarding legal advice related to Solvay acquisition" and the work product doctrine for document 29; (2) attorney-client privilege and work product doctrine for documents 22, 23, and 24 described as "[p]resentation[s] prepared at request of counsel regarding legal advice related to due diligence of Solvay acquisition"; and (3) attorney-client privilege and work product doctrine for document 30 described as a "[p]resentation regarding legal advice related to litigation as part of Solvay integration prepared at the request of counsel."

According to AbbVie, these documents were all prepared "as part of its due diligence before acquiring the Solvay pharmaceutical business."  Siatis submitted a sworn declaration explaining that "[m]any of these presentations contained legal

---

10. AbbVie has not supplied the court with documents 21 and 28 and represents that the parties have resolved the dispute concerning these documents.

advice that I or others in Abbott's legal department provided, as well as requests for me or others in Abbott's legal department to provide legal advice on issues that at the time still needed to be addressed."  Siatis added that "[t]he redacted material is not 'business information'—although the legal advice was on the subject of Solvay's business."

The court begins with documents 22, 23, 24, 29, and 30.  Although these are Abbott documents created by non-attorney employees as a part of its due diligence research for the possible acquisition of Solvay, AbbVie claims the work product doctrine applies.  AbbVie cites <u>Louisiana Municipal Police Employees Retirement System v. Sealed Air Corp.</u>, 253 F.R.D. 300, 308 (D.N.J. 2008), in support of this proposition.  However, <u>Louisiana Municipal Police</u> does not apply here.  In that case, the United District Court for the District of New Jersey held that the work product doctrine applied to documents prepared because of an anticipated acquisition where "the primary purpose of the transaction was to insulate an entity from multiple liability claims."  <u>See</u> <u>id</u>. at 307.  The litigation "[wa]s what the whole deal was about."  <u>Id</u>. at 308.  As such, the acquisition documents were "prepared primarily for legal purposes."  <u>Id</u>.  However, that court noted that the case before it presented a "somewhat unusual situation" and, typically, "[a]lmost all corporate transactions are business based. . . .

-28-

in most circumstances the business aspect, i.e., the growth of business and development of profit, is the engine driving the deal." Id. at 307.

In this case, the documents were not prepared because of litigation and the attorney work product doctrine does not apply.  Unlike Louisiana Municipal Police, Abbott has put forth no argument that it acquired Solvay for the purpose of acquiring its litigation.  Rather, as the contested documents demonstrate, Abbott acquired a vast product portfolio from Solvay for the typical reason — because it believed doing so would be profitable.  These presentations were not created because of litigation, but were created for the purpose of informing Abbott's business decision to acquire Solvay.  Even if Abbott did not anticipate becoming involved in any Solvay-product litigation after acquiring Solvay, Abbott would have created these documents to inform its business decision nonetheless. Here, as "in most circumstances . . . the growth of business and development of profit, [wa]s the engine driving the deal."  Id.

AbbVie also claims the attorney-client privilege for documents 20, 22, 23, 24, 25, 26, 27, 29, and 30.  We disagree. None of these due diligence documents is privileged.

-29-

Taking documents 22 and 23[11] first, according to the privilege log, they were created by a non-attorney employee and sent to Siatis and two other in-house counsel.  By declaration, Siatis has claimed that the redacted portion contains a request for legal advice addressed to the legal department.  We disagree.  AbbVie has not demonstrated that these are legal issues, rather than business issues.  However, even if the court were to find that these due diligence presentations mention legal matters, these presentations were created for business purposes.  To the extent that these due diligence documents reference legal issues, this was done to provide context for a business acquisition decision, not to obtain or provide legal advice.  La. Mun. Police Emps. Ret. Sys., 253 F.R.D. at 306. Thus, "the communication in question was [not] made for the express purpose of securing legal not business advice.'" Kramer, 1992 WL 122856, at *1.  Further, the redactions note the need to review contracts as a part of the due diligence effort. This is not a request for or provision of legal advice.  Rather, it is simply a notation concerning a task that Abbott seeks to accomplish before acquiring Solvay.  But for the privilege, Abbott would nevertheless have made these notations in accomplishing its due diligence.  Construing the privilege

---

11.  The FTC only challenges the redactions on Bates-numbered pages AGEL-PA-006-0000138, AGEL-PA-006-0000139, AGEL-PA-006-0000145, and AGEL-PA-006-0000152.

narrowly, we find that the privilege does not apply to these business communications.[12]

The same is true for documents 20, 25, 26, and 27 entitled "Project Chocolate PPD Commercial: Due Diligence – Commercial (US)."  In these documents, Abbott assessed: (1) Key Findings/Major Issues; (2) Key Brand/Forecast Issues; (3) Follow-Up Required; and (4) Recommendation and Red Flags with regard to numerous Solvay products.  The due diligence documents analyzed business concerns that could have arisen in acquiring Solvay's products.  These business concerns included annual sales, product marketing and promotion, market competition, potential research issues, and development strategies.

AbbVie has not carried its burden to prove that these communications were made for the purpose of obtaining or providing legal advice.  Although the subjects referenced in the document, including contract obligations, market entry dates, and patent protection, could be concerned with legal advice, they are here discussed only to the extent that they have business implications.  Every reference in a business document to a contract obligation cannot be legal advice or the attorney-client privilege would broadly apply to many non-legal, business communications.  Such an interpretation would be inconsistent

_____

12.  As to the redacted portions on AGEL-PA-006-0000152, we will not require production because these redactions specifically reference unrelated products, as stated in Siatis's declaration.

with the mandate of our Court of Appeals that the attorney-client privilege be narrowly construed.  See Westinghouse Elec. Corp., 951 F.2d at 1423.

Similarly, where Abbott mentioned a likely market entry date for generic competitors and the expected duration of patent exclusivity, this was to prepare a strategy for marketing and promoting Solvay's products.  Even though in-house counsel may have been consulted to help determine the market entry date for those competitors, this does not mean that any document using that date must be privileged.  Moreover, counsel's role in these documents is unclear where the documents were not prepared by or sent to counsel.  Although Siatis's declaration asserted that the privilege should apply, it does not provide any additional information to help the court understand counsel's role.  See In re Avandia, 2009 WL 4807253, at *3; SmithKline Beecham Corp., 232 F.R.D. at 477.  Accordingly, AbbVie must produce the redacted sections that relate to AndroGel.

As for document 24,[13] only the redactions on Bates-numbered page AGEL-PA-006-0000155 concern AndroGel.  The declaration of Siatis stated that although the document was prepared by a non-attorney, the redactions contain the mental

---

13.  AbbVie's briefing papers explain that the fifth bullet point under the "Follow-Up Required" heading was inappropriately redacted and that it has produced an updated document 24 without redacting that portion.

-32-

impressions and legal advice of in-house counsel. The court disagrees. This is another due diligence document created pursuant to a business strategy. Legal issues are referenced only to the extent that they have specific business implications. For example, redacted portions concern Solvay's obligations under an agreement held by Solvay. Abbott only discussed this agreement to assess its business decision to acquire Solvay, not to obtain legal advice.

Documents 29 and 30 were drafted by a non-attorney Abbott employee and sent to several Abbott attorneys and a non-attorney. These documents are essentially identical. The redacted portion falls on a page titled: "US Commercial Solvay Integration Highlights as of Oct 15, 2009" under a subheading titled: "Notable Commercial Learnings." As above, to the extent that these documents reference regulatory requirements, they reflect business, not legal, concerns. See In re Avandia, 2009 WL 4807253, at *6; In re Grand Jury Matter, 147 F.R.D. at 85. Although the documents were sent to counsel by a non-attorney, AbbVie claims that the documents contain, not request, legal advice on FDA proceedings. AbbVie has not explained how legal advice came to be incorporated into this document created by a non-attorney nor in what capacity the document's author created these documents. AbbVie has not met its burden to establish that these documents are privileged.

-33-

Documents 31 to 34 are emails exchanged between counsel for Abbott and counsel for Solvay in October 2009. These emails were entirely withheld from the FTC. AbbVie's privilege log describes these documents as "[e]mail thread[s] involving counsel for Solvay, Shannon Klinger, and counsel for Abbott, Steven Gersten and Perry Siatis, requesting and providing information for the purpose of giving legal advice and providing legal advice regarding Perrigo Paragraph IV letters." AbbVie maintains that these emails are protected under the attorney-client privilege, including joint defense and common interest, and the work product doctrine. By sworn declaration, Siatis stated that Abbott and Solvay shared a common legal interest at the time of these emails because they had signed an acquisition agreement on September 26, 2009. Siatis asserted that "[b]ecause Abbott agreed to acquire Solvay . . . Abbott and Solvay shared a common legal interest with respect to AndroGel." The acquisition was completed in February 2010.

The court finds that the attorney-client privilege applies to these emails between privileged persons sent for the purpose of providing and receiving legal advice, and that a third party's participation in these emails did not result in a waiver of the privilege. We also find that the common interest doctrine applies because Solvay and Abbott "share[d] at least a substantially similar legal interest" in actual or potential

-34-

litigation against a common adversary.  See In re Teleglobe,
493, F.3d at 365.  The common interest doctrine applies "even if
there is no 'final' agreement or if the parties do not
ultimately unite in a common enterprise."  See Katz, 191 F.R.D.
at 437.

        Having signed an agreement to acquire Solvay on
September 26, 2009, Abbott and Solvay shared a common interest
in litigation concerning Solvay products when these emails were
exchanged in October 2009.  In addition, unlike the due
diligence documents discussed above, these email communications
were made "to obtain informed legal advice which might not have
been made absent the privilege."  See Fisher v. United States,
425 U.S. 391, 403 (1976).  The emails concern a specific and
identifiable litigation issue that concerned Solvay as the
holder of the '894 patent and Abbott as the agreed-acquirer of
those patent rights.  See Katz, 191 F.R.D. at 437.  As such,
documents 31, 32, 33, and 34 are privileged and need not be
produced.

        As for documents 35 to 39, AbbVie's privilege log
asserts the attorney-client privilege for "[e]mail thread[s]
memorializing and forwarding legal advice, requesting
information for the purpose of obtaining legal advice, and
providing information for purpose of obtaining legal advice from
counsel, Joseph Mahoney, Walt Linscott and Legal Department,

-35-

regarding AndroGel patent filing and AndroGel patent communication strategy."  AbbVie states that these emails concern a patent communication plan for notifying potential `894 patent infringers.[14]  On the other hand, the FTC characterizes documents 35 to 41 as "an email chain among business people relating to a public relations plan."  The email subject line reads: "AndroGel Patent Communication Plan."

First, these January 2003 emails are relevant to the present litigation.  Although AbbVie asserts that resolution of the present litigation will be "determined solely from the public record, informed as necessary by expert testimony," this is not correct.  The FTC has alleged that AbbVie filed sham patent litigation.  The `894 patent issued on January 7, 2003. Emails written by AbbVie's predecessor, Solvay, in January 2003 about the nature of the `894 patent are certainly relevant to the FTC's claims.  These emails shed light on how Solvay and its competitors perceived the patent at the time it was issued.

Second, these emails do not fall within the ambit of the attorney-client privilege.  The only attorney recipient of these emails, in-house counsel Walt Linscott, is merely copied on the email thread and does not contribute to the discussion.

---

14.  AbbVie also argues that the FTC's privilege challenge is untimely because the FTC had these privilege logs since 2007 and never challenged them in prior patent litigation.  This argument is without merit.

See SmithKline Beecham Corp., 232 F.R.D. at 478.  Furthermore, these emails concern a business strategy, not a legal strategy. However, to the extent that any advice is provided in these emails, it appears to come entirely from non-attorney employees. By sworn declaration, outside counsel Joseph Mahoney ("Mahoney") stated that he provided the legal advice to inform those non-attorneys' opinions.  But the non-attorneys offered varying and contradictory opinions about the correct course of action. Mahoney has not identified the individual or individuals to whom he provided advice nor what the nature of that advice was. Mahoney is not even included on any of these emails.  Because the non-attorney participants had differing ideas, these cannot all reflect Mahoney's legal advice.  AbbVie has not met its burden to demonstrate that the privilege applies where it "has failed to 'provide sufficient detail to demonstrate fulfillment of the legal requirements for application of the privilege.'" See SmithKline Beecham Corp., 232 F.R.D. at 477 (citation omitted).

As for document 40, AbbVie's privilege log claims the attorney-client privilege for an "[e]mail attachment memorializing and forwarding legal advice from counsel, Joseph Mahoney, regarding AndroGel patent application and patent prosecution."  The email is dated August 27, 2001 and the attached meeting notes are dated August 23, 2001.  While the

-37-

email was provided in full, a section of the attached meeting notes labeled "Patent protection" was redacted.  We find that the redacted portion of the document provided legal advice or opinions of the patent attorney to the client.  It specifically discussed and conveyed the patent attorney's legal impressions to other employees so that they could adhere to that advice.  See King Drug Co., 2013 WL 4836752, at *8.

The privilege log concludes with document 41.  It describes the document as a "[d]raft presentation attached to email reflecting and memorializing legal advice regarding patent exclusivity assumptions and potential litigation involving AIP, prepared in anticipation of litigation of same."  AbbVie claims the attorney-client privilege and work product.  The email was provided in full and explains that the attachment concerns Key Strategic Initiatives and Objectives.  The email sent by a non-attorney employee requested that the nine non-attorneys and one in-house counsel recipients "review the attached draft and provide your comments/edits . . . regarding the Key Strategic Initiatives and Objectives" and "[f]eel free to also make suggestions on the other sections of the document."  The attached document is titled "Solvay Pharmaceuticals: 5 Year Plan 2002 – 2006."  The FTC only challenges the two redactions that relate to AndroGel.

By declaration, Mahoney, outside counsel for Solvay, stated that the challenged portions "contain the endpoints of [his] legal analysis of certain statutes and regulations as they applied to Solvay's circumstances." The first contested redaction is on an entirely redacted page, AGEL-PA-006-0001492. The table of contents identifies the title of document 41 as "Exclusivity/Generic/Life Cycle/Extension Assumptions." The second challenged redaction is on page AGEL-PA-006-0001498 titled "Commercial Strategy Assumptions." The redacted portion follows an unredacted sentence reading: "Drive AndroGel and Marinol to significant growth."

These documents were created by a business employee for the purpose of planning business strategy for Solvay. Solvay's strategies to extend a product's life cycle and exclusivity are commercial, not legal, in nature. In the highly regulated pharmaceutical industry, business decisions are often made after referencing a statute or regulation. Yet, for example, the length of a patent's exclusivity or plans for launching a product are not privileged simply because they are determined by referencing a statute or regulation. See In re Avandia, 2009 WL 4807253, at *6; In re Grand Jury Matter, 147 F.R.D. at 85. The court finds that the attorney-client privilege does not apply to the redacted statements drafted by business employees to plan Solvay's commercial strategy.

-39-

Finally, the work product doctrine does not apply. AbbVie has not explained how these business planning documents relate to anticipated litigation.  These documents were created in the ordinary course of business and would have been created irrespective of whether any litigation was pending in order to assess Solvay's business strategy for AndroGel.  See Westinghouse Elec. Corp., 951 F.2d at 1423.  The redacted portions of these pages concerning AndroGel must be produced.